(Decided 26th May, 1881.)

PIERRE OVIDE CHERBONNIER, Executor and Devisee *vs.* WILLIAM SETH EVITTS, JAMES A. BUTLER, and others.

*Fraud and Undue influence—Mental incapacity—Void deed.*

Voluntary deed obtained by fraud and undue influence on the part of beneficiaries thereunder, from the grantor, an old man, in feeble health, and whose mind was so seriously impaired as to render him incapable of executing a valid deed or contract, declared void.

APPEAL from the Circuit Court for Caroline County, sitting as a Court of Equity.

The case is stated in the opinion of the Court.

The cause was argued before Bowie, Miller, Alvey and Irving, J., for the appellant, and submitted for the appellees.

*Wm. Shepard Bryan,* for the appellant.

*George M. Russum,* and *J. B. Brown,* for the appellees.

The cause was re-argued before Grason, Miller, Alvey, Irving, Ritchie and Magruder, J.

*Wm. Shepard Bryan,* for the appellant.

*John H. Handy,* for the appellees.

A brief was filed in behalf of the appellees, by *John B. and E. H. Brown,* and by *George M. Russum.*

Ritchie, J., delivered the opinion of the Court.

The appeal in this case, is from a decree of the Circuit Court for Caroline County, refusing to set aside a deed of gift made by one Seth H. Evitts, since deceased, conveying all his real property, a farm of about three hundred acres, to William Seth Evitts and James A. Butler, subject to a life estate in himself, &c.

The complainant, P. O. Cherbonnier, files his bill in the two-fold and several capacities of executor and devisee under the last will of said Seth H. Evitts, which has been duly admitted to probate, assailing the validity of the deed upon the grounds of mental incapacity, fraud and undue influence.   The answer of the respondents takes direct issue with the allegations of the bill in these respects ; and a great deal of testimony was taken on both sides.

As in all cases of this sort, there is much conflict between the witnesses.

Cherbonnier *vs.* Evitts, *et al.*

Where mental unsoundness is not of a violent or pronounced type, contrary opinions as to the business capacity of the individual, are naturally to be looked for among laymen, or those unskilled in detecting the symptoms and effects of mental derangement. Indeed, the inquiry is then one of intrinsic nicety, and an unusual degree of scrutiny and discrimination is required to properly determine it.

The issue of fraud and undue influence is, likewise, one commonly marked by conflicting testimony. The accusation of fraudulent dealing is calculated to provoke the sharpest antagonism ; and this is naturally reflected in the proof. It is a charge that is usually pressed with vigor, and repelled with corresponding warmth. The party accused of conduct so odious, if guilty, will be impelled by the same cupidity that led him to concoct his scheme, to carry it to success ; while, if innocent, he will be spurred by regard for his good fame, and his sense of wrong, to make good his vindication.

In the struggle over such an issue, as in that of mental incapacity, much conflict of testimony is to be expected ; and we, accordingly, have this condition of the evidence in the present case.

But, notwithstanding the many and irreconcilable differences between the witnesses who testified in this cause, after carefully sifting the testimony and assigning their proper weight to the controlling facts connected with the history of the grantor, and the transactions appertaining to the deed he executed, we are of the opinion this instrument ought to be annulled.

In determining whether an owner in disposing of his property by way of gift, has done so with a sound mind, and in the exercise of his own deliberate will, not only his condition at the time of the execution of the instrument and the circumstances of the act of execution itself, are to be considered, but also his previous life, habits and relation

to others, so as to ascertain the natural or probable objects of his bounty, and especially, to discover his settled purpose, if any he had, in regard to the disposal of his estate.

Indeed, when a particular conveyance is impeached, as in this case, upon the grounds of mental weakness and fraudulent influence, evidence bearing on these issues derived from the history of the grantor, prior to and outside the act in controversy, is obviously entitled to greater weight than what transpires at or about the date of the execution of the instrument.

Unsoundness of mind, when not reaching to mania or idiocy, is compatible with the semblance of perfect reason on occasion or for a period; and, where undue influence has been craftily plied, it so insidiously possesses the mind of its victim with false impressions or delusions, that he often voluntarily, and even eagerly, performs the act, into which he has been skilfully duped.

It does not necessarily follow, therefore, that if the grantor in the present case, willingly executed the deed in question, that he was, in a legal sense, either mentally capable of doing so, or that the act was his own.

It might be conceded, though the proof by no means establishes it, that he himself suggested and directed the execution of the deed, and still the weight of evidence would be against the validity of the instrument.

The grantor was about seventy-nine years of age when he signed the deed, the date of which is the 20th day of December, 1876. On the 27th day of August, 1875, he executed a last will and testament, which was duly admitted to probate by the Orphans' Court of Caroline County after his death, which took place on the 22nd of September, 1877.

By this will, the deceased devised as follows, viz.,.

"To my black. girl, Sarah Jane Kirby, five hundred dollars, and the balance of my property, real, personal

and mixed, to my sister Lucretia Evitts, during her natural life-time, and after the death of my said sister Lucretia Evitts, I give all the said property, real, personal and mixed, to my friend Doctor Pierre Ovide Cherbonnier, of Talbot County, the husband of my niece, Anna Maria.

"My six silver tea spoons, I give to my niece, Anna Maria Cherbonnier, wife of my above named friend, O. P. Cherbonnier.

"My silver table spoons, six in number, and my old silver watch, which formerly belonged to Seth H. Evitts, my uncle, to Sarah Ann Towers, wife of Elijah Towers." Then follows the appointment of Dr. Cherbonnier executor, and the usual clause revoking all former wills.

But sixteen months elapsed between the execution of this will, and the signing of the deed.

That the deed should be so diverse from the will, not only as to the disposal of his property, but as to his sentiments toward Dr. Cherbonnier and his wife, is indeed striking. In the will, he speaks affectionately of the Doctor as his friend, and the husband of his niece, and as such, leaves him substantially his entire estate; in the deed, he conveys his estate to wholly new beneficiaries, and affixes to the Doctor and his niece, the stigma of bad treatment of himself, and robbery of his property.

The moods and dispositions of the grantor are in such marked contrast, as reflected in these two instruments, that the history of the origin, nature and duration of the motives and purposes which led to their respective execution, becomes an obvious guide in determining the issue whether the latter is the product of a sound mind and independent will.

Upon turning to the proof, we find that the execution of the will in favor of Dr. Cherbonnier, was but the carrying out of what may be termed a life-long purpose, formed by Seth H. Evitts, in the vigor and prime of his

manhood, cherished for over thirty years, based on natural and potent considerations, and in accord with his business affairs and family ties.

He was unmarried and childless, living with his maiden sisters, whom he survived. They, when alive, with his colored servant, Jane Kirby, constituted his household. After the death of his sisters, his heirs-at-law were his niece, Mrs. Cherbonnier, wife of the doctor, who for the most of their married life, lived near him on the most intimate and affectionate terms, and two nephews; but these nephews resided in a distant State, comparatively strangers to him. His only other relatives were some second or third cousins.

Dr. Cherbonnier testifies that so far back as 1848, Seth H. Evitts expressed his intention to leave him his property. The occasion was of a character to impress itself upon the Doctor's memory, and he details with particularity what took place, as follows:

"I sold at public auction on the 23rd of May, 1848, as executor, the real estate of his brother, John Evitts; he told me to inform him when to stop bidding for the farm; I answered that I would not tell him to stop, for I was interested in getting as much as I could for the property; he remarked to me then, that that farm was a part of his mother's maiden property, and that he wanted to buy it for me, so that I would have the whole at his death. I told him I did not want it. He then said that his brother Joseph, the father of my wife, did not get his share of his mother's estate, and that *he wanted to repair an injustice;* and on *several other occasions subsequent* to that period, he intimated to me his intention to leave his property to me at his death."

We have in this piece of uncontradicted testimony, proof of the emphatic declarations of Seth H. Evitts, made so early as 1848, and repeated on different occasions afterwards, of his purpose to leave his estate to the

Doctor ; and these expressions of his purpose are fortified by the motives he avows and the reasons he discloses. He regarded the Doctor in the double aspect of his friend, and the representative of his niece ; and in his latter relation assigns a motive of the highest nature—a sense of moral obligation to repair an act of wrong and injustice by which his niece, in the family divisions of property, had been deprived of her just proportion.   There is here combined the deliberate and oft-repeated expression, of his intention to leave his property, as he ultimately did dispose of it by his will, and the strongest and most rational of reasons for so doing ; a disposition of it, without which the injustice he felt and acknowledged, would not be repaired.

James Hignutt and other disinterested witnesses, also testify to repeated declarations by him at long intervals, to the same effect.

The testimony of Mrs. Cherbonnier to the affectionate relations between herself and husband, and her uncle, is full and positive.   It shows not only the cordial terms on which she herself stood with Mr. Evitts, but the even greater attachment he had formed for her husband.

She says : "I often heard him speak fondly of the Doctor.   He told me that he loved me, and would do any thing for me, but he loved my husband best."   This particular declaration of his affection for the Doctor, was on the occasion of a visit to him in 1873, during the four years the Doctor resided in Baltimore.

But satisfactory as the testimony of the Doctor and Mrs. Cherbonnier, and of other witnesses, is on this point, the frequent expressions of Seth H. Evitts in his own letters, conclusively establish that the intercourse between them throughout the thirty-five years that elapsed after the marriage of the Doctor to his niece, was an uninterrupted history of kind offices and mutual devotion. Whether as physician, landlord, counsellor or friend, the

Doctor was always at the command of Mr. Evitts ; and his services and friendship naturally inspired in the latter his unbounded confidence and warmest interest in return.

Extracts from the letters of Mr. Evitts during the four years Dr. Cherbonnier resided in Baltimore fully illustrate this.

In a letter to the Doctor, dated May 24, 1870, he says : "You said you was coming soon ; I should be very glad to see you, though I should be very sorry to part with you when the time came for parting ; for I seem loansom ever sence you left me under the walnut tree. I never shall forget that time ; the parting with the best friend I had in this world." He then proceeds to inquire as to how the Doctor is getting along in his business, &c., and after sending his love to all the family, concludes : "I shall forever remain your friend."

In a letter bearing date July 11, 1870, he says : "You nurst me in sickness, and been a better friend to me than both my brothers ever was. Can I forget such a friend ? No, never ; if necessity required it, I would divide the last dollar with you."

On January 12th, 1871, he concludes a letter with : "I should be glad to see you, and take you by the hand once more. This from your loving friend."

And so in a letter written on September 11th of the same year, he conclndes : "My love to you and family. This from your true friend."

And on November 2nd, following, he writes : "I would like you to send me one sack of salt and one *cag* of nails, if you will let me pay you for them. * * Your sincere friend."

In the year 1872, September 28th, he declares in a letter of that date : "My love for you is as strong as ever."

In the fall of 1874, October 16, being ill, he writes : "I am very sick. Come and see me if you can."

On March 30, 1875, he writes briefly and painfully about his health: "I am not well; I 'ave a giddy head-ake. Sometimes I fall and hurt myself. Write soon and tell me what to do for it. Lucretia, [his sister,] is doing as well as common. I cannot wright as well as I ust to do. My love to you and family."

The last two notes were written to the Doctor after he removed from Baltimore, taking up his residence in Talbot County.

In August of the following year, 1876, Mr. Evitts lost his remaining sister, Lucretia. Her death was a great blow to him, especially in his enfeebled and lonely condition.

At his own request, shortly after the burial of his sister, Dr. Cherbonnier took him to his house, where he remained eight or ten days, and was then taken back, for a visit, to his farm. He was brought back again next day to the Doctor's. After staying there two or three weeks longer, he expressed a desire to vote, and the Doctor took him back to his own farm. Here the Doctor visited him every other week, looking after the management of his place for him until he himself was taken ill in November with a severe and protracted spell of rheumatism. He did not see Mr. Evitts after that.

On the 20th of the next month the deed in issue was executed.

The will, which was made August 27th, 1875, as stated, and which was witnessed by Col. Wm. Hayward, is described by him as "the old will with some alterations." This will was also drafted by Col. Hayward, at the request of Mr. Evitts, who, the Col. testifies, both out of and in the presence of Doctor Cherbonnier, declared his testamentary wishes to be as expressed therein.

On the 2nd of April, 1876, he made another will, modifying the one first mentioned in some minor respects, but renewing in it the devise to Dr. Cherbonnier, as contained in the first.

After the death in August, 1876, of his sister Lucretia, Seth H. Evitts on the 22nd of September following, made another will, substantially like the former ones, devising in it the property in which his sister Lucretia would have had a life estate had she survived him, absolutely to Dr. Cherbonnier.

Both these last two instruments were in accordance with his wishes as expressed when they were made, but were not admitted to probate by the Orphans' Court upon the ground that the deceased was at the time of their execution incompetent to make a valid will and testament.

This action of the Court leaves standing the will of August, 1875, which in substance is identical with those denied probate, so far as Dr. Cherbonnier is affected, Lucretia Evitts having died before the testator. Practically, therefore, the Doctor will take the real estate of Seth H. Evitts as his devisee, unless he is deprived of the same by the deed.

Without citing testimony other than that referred to, we deem it established that it was the deliberate and long cherished purpose of Mr. Evitts to make Doctor Cherbonnier the devisee of his estate.

No question is made of this by any one for that portion of his life when his sanity was undoubted.

Let us inquire then for the explanation of the sudden abandonment by Seth H. Evitts, at the advanced age of seventy-nine years, of his life-long purpose and life-long friendship.

And, first, let us see what causes are set forth in the deed itself for so extraordinary a change, and who are the substituted objects of his favor and bounty.

The recitals and considerations are sundry ; and seem to be adroitly arrayed in the nature of an anticipated defence, as if this illiterate old farmer were familiar with the force of the presumptions thrown around an heir-at-law, and knew the best legal devices for obstructing an

expected attack upon the *bona fides* of an instrument.
Such scrupulous attention, too, is bestowed upon the mere
formalities of execution, that a crowd of witnesses are
assembled on the occasion of its signing, giving the scene
the effect, as one of them described it, of being done in
"open Court." Three witnesses attest the deed, while so
simple an act as the substitution, at the request of Mr.
Evitts, of the word "tablespoons" for "teaspoons," in a
cotemporaneous schedule of property, is formally certified
by *four* witnesses; in order, we presume, to establish
beyond cavil, through this mental effort, his unimpeacha-
ble strength of mind and freedom from influence.

Mr. William S. Evitts, one of the grantees, collected
the spectators who attended upon, and attested the sign-
ing of the deed, and went for the attorney who drafted it.
His co-grantee, Mr. James A. Butler, was likewise in
attendance.

The reasons or excuses assigned in the deed for the
exclusion of his next-of-kin from all benefit of his estate
are in these words: "Whereas the children of my de-
ceased brother, John Evitts, whose residences, if living,
are unknown to me; and whereas I have recently been
badly treated by my niece, Mrs. A. M. Cherbonnier, and
her husband Dr. P. O. Cherbonnier, they having taken
from me large sums of money in gold and Legal Tender
or National Bank notes, in addition to money from sales
of my corn and wheat, and two promissory notes given by
Dr. P. O. Cherbonnier, one for $1600, and the other for
$1000, together with property belonging to me taken with-
out my knowledge and consent:"—Thus imputing to his
niece and her husband a high-handed and wholesale lar-
ceny of his effects. Then, proceeding, " in consideration
of the premises and for divers other good and valuable
considerations," and in consideration of "their services
and attention to him in his old age," he grants unto Wil-
liam Seth Evitts and James A. Butler, to take effect on his

Cherbonnier *vs.* Evitts, *et al.*

death, his real estate, containing three hundred acres "in fee, to be divided between them in such portions as they shall agree upon." He then gives to his cousin, Sarah A. Towers, wife of Elijah Towers, a promissory note due him from her husband, reserving the right to receive such portion of the interest thereon during his life as he might require." The instrument concludes by revoking a power of attorney given Dr. Cherbonnier in September, 1876.

When we come to probe the grounds set out in the deed for the disposition it makes of his property, they seem without genuine foundation.

As to the first recital of the deed, wherein it speaks of his nephews, Capt. John S. Evitts and Frank Evitts, vaguely as "the children of his deceased brother," apparently not recollecting their names, and even of whose being alive he expresses doubt, and of whose residence he says he is in total ignorance, we find it strangely at variance with the fact that among his papers was found a letter from these very nephews, written less than two years before the deed was made, in which they speak of a visit and former letters to him, inquire of family matters, ask a reply, and give, minutely, their address as No. 17 Eden St., Salem, Mass.; and that a memorandum in his own handwriting in two places, of their address, was also found among his papers.

The imputations against his niece and her husband seem, from the proof, to be wholly groundless. There is not even a pretext for them as against Mrs. Cherbonnier, who at no time seems to have had anything to do with the management of his affairs or possession of any of his effects, and, always, even after the execution of the deed, to have retained his affection and good will. She testifies that she asked him why he made the charges in the deed; and he replied, that he never did it, emphasizing the denial by twice repeating it. And the witness Slaughter, in his testimony, says: "I saw Mrs. Cherbonnier at Mr. Evitts' house some time in warm weather, in 1877, [after

the deed was executed;] they seemed to be friendly. When she left, he cried, and he made her a present of two or three bed quilts."

As to the accusation of their taking notes due from Dr. Cherbonnier, it is pronounced utterly false by them both, and it is worthy of notice that although a letter dated December 13, 1876, purporting to be from Seth H, Evitts, written in his behalf by Wm. S. Evitts, expresses a wish for the speedy return of two notes of small amount, one for $75 by said Wm. S. Evitts, and one for $150 by Alex. Blakeley, no mention is made of the Doctor's alleged notes, aggregating several thousand dollars.

As to the possession of the property which Doctor Cherbonnier did take, it seems to have proceeded from laudable motives, and not only to have been justifiable, but to have been expressly desired by Seth H. Evitts.

It is not controverted that upon the death of his sister, Lucretia, Mr. Evitts was greatly depressed; that he was very aged, infirm and palsied, and that his money, notes and valuables were in the custody of the colored woman, Jane, who had complete control of everything up stairs where he kept his money, while James A. Butler had control of everything down stairs where he kept his promissory notes and papers, and he and the colored woman had access to his keys and the use of them.

When Dr. Cherbonnier, in compliance with the request of this solitary and afflicted old man, took him to his own house, it was manifesting only a proper concern for his interests to remove his money and other valuables to a place of security. This was proper, not only as regards Mr. Evitts, but also on his own part, as the recognized devisee of property, whose owner was unable to watch over it, and who could not long survive. And doubly important was such a precaution, if he had reason to suspect the old man's helplessness would be taken advantage of by those around him, to directly spoliate him, or

that a scheme was on foot to reach the same end by supplanting him in his testator's confidence.

But apart from the inherent propriety, under the circumstances, of taking in charge Mr. Evitts' portable effects, the proof shows he did so by his direct authority, and in express recognition of his own succeeding ownership. The Doctor testifies: "When I went to the funeral of his sister Lucretia, I found his money in the possession of the colored girl, and when I told him of it, he requested me to take it home with me, and remarked : *' it is yours anyhow.'* \* \* I deposited the money in the Easton Bank, and made a memorandum of the amount and of the notes which I received ; which memorandum is herewith filed."

In another part of his testimony, his attention having been called to the aspersions in the deed, the Doctor says : "When he was at my house, everything was done for his comfort. \* \* As to the notes of $1000 and $1600, which they say I owed him, it is all false. \* \* \* Everything that was done by me was with his knowledge and consent, for I was the only one who had taken care of him and his property ; my wife was his only heir-at-law in this State, and he was surrounded by a gang of mercenaries, whose apparent aim was to rob him when alive, and who when he was in *articulo mortis* sent for a party to write his will ; besides, my reason for acting as I did was, I knew he wanted me to have his property."

That the Doctor's apprehensions were not without foundation is shown not only by the deed itself, executed so shortly after Mr. Evitts returned to his farm, but from other facts also, among them, that James A. Butler had obtained in 1875 or 1876 from Mr. Evitts a lease of his farm with everything thereon for the period of five years, upon discovering which the Doctor mentioned the matter to Mr. Evitts, who did not seem to be aware of it, and requested him to obtain the lease for him, which he

accordingly did, and, when obtained, threw it into the fire with Mr. Butler's consent.    None of these facts about this lease are denied by Mr. Butler ; he even states that, at first, a lease was gotten for ten years, though abandoned for the one for five.

It would be no cause for astonishment, even had he not been disabled by sickness, had the Doctor shown no alacrity to comply with the demand for the return of the money and papers made in the letters of Mr. Evitts dated November 28, and December 13, 1876, of which letters William S. Evitts, if not the actual inspirer, was the sympathetic penman.

And when we come to consider the substitution of the said James A. Butler and Wm. S. Evitts as the objects of his bounty, we find no adequate explanation of it in their previous relations to him.

His sense of obligation to them, as stated in the deed, must have been a sudden revelation ; for we find no trace of its existence up to within about two months of the execution of the deed.

In the summer of 1875, Doctor Cherbonnier lent Butler as his uncle's tenant a pair of mules to carry on the farm ; in the fall of the same year Mr. Evitts requested him to take the mules back, "as *he wanted to get rid of Butler* and thought that was the best way to do it." Indeed, Charles W. Hobbs, one of the respondents' witnesses, testifies that during the Christmas holidays of 1876, about a week after the execution of the deed, Mr. Evitts complained to Butler about entertaining loafers at his, Butler's house; saying Butler would entertain any indolent person, "dead beat," or "loafer," who would not work.

While absent from his farm at Dr. Cherbonnier's in the fall of 1876, he evidently placed no dependence on the fidelity of Butler and Wm. S. Evitts to his interest, for according to Col. Hayward's testimony, he expressed great. anxiety about his stock of hogs, sheep and cattle, alleg-

ing they were being stolen, and wished Dr. Cherbonnier to go after them ; but at the Colonel's suggestion he executed a general power of attorney to the Doctor to take charge of his matters, and thereupon appeared greatly relieved. This is the power of attorney revoked in the deed and succeeded by one executed simultaneously to Wm. S. Evitts.

It is noticeable that while it is not pretended that the old servant, Jane, who in all previous dispositions of his property had been provided for, had forfeited his favor, no mention at all is made of her in the deed.

It is also remarkable that no line or mode of division of the property conveyed to Butler and Wm. S. Evitts, is laid down in that instrument. It indefinitely leaves it " to be divided between them in such portions as they shall agree upon."

True, it is in testimony that it was orally arranged that Jane Kirby was to have a lot of seven or eight acres out of Wm. S. Evitts' portion, and that a survey was afterwards had with reference to the division ; but no explanation is furnished why such important matters were not settled before the execution of the deed, and incorporated therein.

Nor is there any stipulation that the " services " mentioned in the considerations, and daily growing more necessary, should be continued.

There is strong indication in this haste that his moods were too variable, or his mental action too uncertain, to let what seemed to be an auspicious juncture, pass unimproved.

And notwithstanding all the pains taken to fortify the deed against assault, misgivings as to its validity still remained, for an effort was afterwards made to have Mr. Evitts enforce its provisions by a will ; though this will has not come to light.

Thus far in the aspects of the case we find no satisfactory solution of the altered relations of Seth H. Evitts to his niece and her husband.

The ostensible causes put forward, when scrutinized, prove inadequate.

They are really to be found, in our judgment, as the complainant alleges, in the prostrate physical condition and impaired intellect of his uncle, and the fraudulent advantage taken thereof.

The proof unmistakably shows that the mind of Seth H. Evitts was, in legal contemplation, unsound when he resolved to divert his property from Dr. Cherbonnier as his devisee, and executed the deed. That through this unsoundness there had either originated in himself or was inspired by others in close relations to him—and it matters not which—a false impression or delusion as to the conduct of his niece and her husband, which morbid fancy was fraudulently encouraged and taken advantage of in the procurement or furthering of the execution of the deed, by which his irrational prejudice was carried into effect, and thereby his real will, the intention resting on the purposes, obligations and affections of a life-time, thwarted and superseded.

The distorted notion conceived by or suggested to his weakened intellect, and which converted his affection for his niece and her husband into dislike, was that the Doctor had pronounced him a lunatic, and was dealing with him and defrauding him as such.

No fancy to an old man fond of money, and whose mind was really impaired, could have more effectually disturbed his balance and inflamed his temper, or made him a more facile instrument in the hands of those disposed to turn his mood to their own benefit.

This seems to have been artfully done. The proof indicates that both Wm. S. Evitts and James A. Butler, took occasion to recall to him the imaginary offence of Dr.

Cherbonnier, thus intensifying his delusion, and adding fuel to his resentment.

In the letter of November 28th, 1876, in which his change of feeling is first disclosed, and which letter, including his signature, is in the hand-writing of Wm. S. Evitts, he specifically complains of being "treated as a lunatick."

Dr. Hignutt, who was employed by Dr. Cherbonnier, to render his wife's uncle the medical services indispensable to his condition—the prejudice engendered against himself, forbidding his own attendance—testifies: "I heard Mr. Wm. S. Evitts and Jas. A. Butler talking to Seth H. Evitts about Dr. Cherbonnier, saying that he, Seth H. Evitts was crazy, and about his, Dr. Cherbonnier, taking the spoons and his money. On one occasion, in the presence of Seth H. Evitts, Wm. Seth Evitts asked me what I thought of his, Seth H. Evitts' mind. I remarked that his mind was good enough. Mr. Seth H. Evitts had been embittered against Dr. C., and I could not but think that that question was made to embitter him against me, and that was why I made that answer."

The relations of the grantees to Mr. Evitts on and about the time of the making of the deed were, if not "confidential" in the strict sense of the term, such, nevertheless, as the law regards with scrutiny. They were in close intercourse with him; Butler attending to urgent bodily needs, that in his weakness he could not provide for himself, and being his constant companion and driver; while Wm. Seth Evitts acted as his amanuensis, superintended the execution of the deed, superseded Dr. Cherbonnier in looking after his affairs, and assumed sole charge of his property under the power of attorney, executed simultaneously with the deed, which revoked the one given to Dr. Cherbonnier.

The opportunities for exercising an undue influence were at hand, and we believe they were so availed of.

The law is jealous to defeat a fraudulent use of the means afforded by intimacy of association. And it is not, as we have indicated, inconsistent with the exercise of undue influence or artifice, that the instrument assailed was executed voluntarily, and with a knowledge of its contents.

The following cases are illustrative in this connection:

In the case of *Huguenin vs. Baseley*, 14 *Ves.*, 275, before Lord Chancellor ELDON, in which the deed was impeached on the ground of undue influence, and the confidential relation existing between the grantor and grantee, Sir Samuel Romilly argued that " the rule is not confined to attorneys or persons entitled to reward. *Proof vs. Hines, For.*, 111, was the case of a tradesman who officiously interfered. The relief stands upon a general principle, applying to all the variety of relations, in which dominion may be exercised by one person over another." He cited *Hatch vs. Hatch*, 9 *Ves.*, 292, and *Bridgeman vs. Greene*, 2 *Ves.*, 627, in which there was much evidence that the person was perfectly aware of what he was doing, and repeatedly confirmed it. Upon that, Lord Chief Justice WILMOT'S observation is, "that it only tends to show more clearly the deep-rooted influence obtained over him."

Lord ELDON, after referring to those cases with approbation, applying the principle to the case before him, in which the grantor was a widow in the prime of life, said: "The question is not whether she knew what she was doing, had done, or proposed to do, but how the intention was produced ; whether all that care and providence was placed around her, as against those who advised her, which from their situation and relation with respect to her, they were bound to exert on her behalf."

In the case of *Dent vs. Bennett*, Lord COTTENHAM quoted Sir Saml. Romilly's language uttered thirty years before, and incorporated it in his opinion, as an established principle of equity. 4 *My. & Cr.*, 277.

The same doctrine has been frequently announced in American Courts. *Taylor vs. Taylor*, 8 *Howard*, 183.

In *Sears vs. Schafer*, 2 *Selden*, 268, it is said: "In some cases undue influence will be inferred from the nature of the transaction alone; and in all cases a Court of equity interposes its benign jurisdiction, to set aside instruments executed between parties, in which one party is so situated as to exercise a controlling influence over the will, conduct and interests of another."

*Harvey, et al. vs. Sullins*, 46 *Mo.*, 147, is the case of a will. There the Court say: "Where a person is so sick, worn out and enfeebled, that he is a mere passive instrument in the hands of those who produce the will, it is evident such will ought not to be permitted to stand."

We have a number of Maryland decisions of the same general tenor, viz., *Brogden vs. Walker*, 2 *H. & J.*, 285; *Carberry vs. Tannehill*, 1 *H. & J.*, 224; *Highberger vs. Stiffler*, 21 *Md.*, 352; *Todd vs. Grove*, 33 *Md.*, 194, and the case of *Eakle vs. Reyuolds*, 54 *Md.*, 305; as also *Bowers, et al. vs. Stumpff, et al.*, (*Opinions Unreported, Liber S. C. J., No.* 1, *folio* 146.)

It is not necessary in the present case to go so far as to rest our decision upon the distinctive ground, that the grantees of the deed stood in such relations of trust and confidence toward Seth H. Evitts, that it is incumbent upon them to show affirmatively that they exerted no dominion or undue influence over him.

We are convinced from the proof, that the mind of Seth H. Evitts was greatly impaired, and that its perverted action was fraudulently taken advantage of by means of the deed in question.

While as to the allegation of his mental unsoundness, there was much difference of opinion in the testimony, when we consider the facts connected with his physical condition, which are conceded by both sides, and the evidence of the medical witnesses, who were obviously the

most competent to pass upon such a question, we deem it clearly established.

It is not disputed that Seth H. Evitts was almost eighty years of age; that within two years, he had suffered from two or more strokes of apoplexy, that had left him paralytic, visibly affected in appearance and speech, and almost without power of locomotion; and that his disabled condition steadily grew worse.

The grantee, James A. Butler, himself, on cross-examination, describes his bodily condition as follows: "He needed some one to lead him about, and help him around; the forepart of the year 1876, he could dress himself, but the latter part of the year, I had to dress, wash and clean him, most of the time. He did not have the use of one of his arms quite as well as the other, but he could use one arm well, but not the other; he could use the disabled arm to some extent in dressing himself; he could put on his shoes, but could not shave himself; I do not think he could put on his clothes without assistance in the latter part of 1876."

While among the non-professional witnesses, there is a variance in opinion as to the consequences of his disease and infirmity upon his mental powers, as is generally the case where the reason is not wholly dethroned, and the mind and memory are still equal to some grasp of simple and familiar matters, they all observed the symptoms and condition about the effect of which they differed.

The real nature and effect of these symptoms can be best determined by the physicians who saw him, and have testified.

Of these, there are five: Doctors Cherbonnier, H. T. Goldsborough, G. W. Goldsborough, John W. Hignutt and Enoch George.

Of this number, the only one who has not pronounced him mentally unsound and incapable of executing a valid deed, is Dr. George.

This physician seems to have had a very slight acquaintance with Seth H. Evitts. His only interview with him appears to have been on the occasion of accompanying the counsel to his house when the deed was drafted and signed.

Even he observed the enfeebled and paralytic condition of Mr. Evitts, and admits that he made no particular examination of him. The proof, moreover, shows that while Dr. George does not think he ever made such a statement, the witness, Mrs. Stack, positively asserts that she heard the Doctor remark, when told of the death of Seth H. Evitts, a day or two after it occurred, that "he had been dead for the last five years."

All the other physicians are positive as to his imbecility of intellect, and state the reasons for their opinions.

Dr. Cherbonnier, on seeing him after the letter of March, 1875, in which he writes, "I 'ave a giddy head *ake.* Sometimes I fall down and hurt myself. I cannot *wright* as well as I *ust* to do," says, " he had lost the free use of his right side, and talked with difficulty, and upon inquiry of his sister, I learned that while sitting in his kitchen, he had become unconscious from a stroke of apoplexy, which paralyzed him. * * * That on account of another attack of apoplexy, which Mr. Evitts had in the beginning of 1876, he became a perfect imbecile; he was like a child, and his actions were trifling, his mind became inert; his ideas were few; he submitted to control; acquiesced under influence; his memory referred to events which happened in his young days; he wanted to die; he was unable to walk without assistance; he had to be dressed and undressed; in a word, he was a child, and not able mentally or physically to do any kind of business; his hobby was politics; it was all he talked about."

Dr. G. W. Goldsborongh, a physician of over thirty years practice, and who had known Seth H. Evitts since 1845, testifies, that, the last time he saw him was in

Denton, in the summer of 1876; that from his appearance and conversation he·was of opinion he was suffering from *senile dementia.*

Dr. H. T. Goldsborough, a graduate of 1856–7, latterly a druggist, says he signed a will of Seth H. Evitts in 1876, drawn for him by Col. Hayward, as a witness thereto; but he did so merely as an accommodation, as neither himself nor Doctor Cherbonnier attached any importance to it, and which he did not think him capable of making; that his reasons for saying so are, "that he appeared weak in body and mind; he would answer questions of memory, but did not seem desirous or capable of holding a connected or intelligent conversation; that he did not have the intelligence or perception to do so (make a will) by reason of his advanced years or disease of some kind."

Dr. John W. Hignutt, a regular practitioner for over twenty years, and who had known Seth H. Evitts all his life, saw him as his attending physician nearly every week after his attack of paralysis in February, 1876, until his death, paying him six visits in the course of the very month in which the deed was executed. He testifies, that he was called to him in one attack of paralysis, but believes he had two; that they impaired his body and mind very much; his health was bad all the time; his body and mind were both very weak and feeble; his mental condition was that of *senile dementia;* that from his mind being very weak and childlike, and in this state of *senile dementia,* he did not believe him capable of making a valid deed or contract at any time after February, 1876, until the time of his death.

These emphatic opinions, so impressive when coming from gentlemen of their exceptional qualification to form a correct judgment, and with their opportunities for observation, are of themselves sufficient, apart from the corroborative testimony of other witnesses, to establish a clear case of incapacity.

Cherbonnier *vs.* Evitts, *et al.*

As to the exceptions taken before the commissioner to the admissibility of evidence, we would say that the objection made by the complainant to the testimony of Dr. George, and of the respondents to that of Hon. James L. Bartol, their testimony in our view being competent, must be overruled.    And, however the exceptions taken respectively to the parties Dr. Cherbonnier and Wm. S. Evitts and James A. Butler as competent witnesses, might have been disposed of, our opinion would not have been altered; but these having been mutually withdrawn at the hearing before us, we have dealt with their testimony as in the cause, and have considered it accordingly.    In the view we take of the case, we do not deem it material to pass upon the other exceptions noted.

From the conclusions we have reached upon all the evidence, it follows that in our judgment the deed should be declared void.    We will therefore reverse the decree dismissing the bill, and pass a decree annulling and setting aside the deed in question, with costs to the appellant.

*Decree reversed with costs.*

(Decided 26th May, 1881.)