Elias Eakle and others *vs.* John H. Reynolds.

*Deed of Gift from Uncle to nephew attacked for alleged Incompetency in the Donor, and Fraud and Undue influence in the Donee—Deed sustained—Undue influence.*

On a bill filed to set aside a deed of gift on the ground of the incompetency of the donor, and of fraud and undue influence practiced upon him by the donee, where it was shown that the donee was the favorite nephew of the donor, that he had lived with his uncle from his earliest childhood, and that the most affectionate relations existed between them; that for several years prior to the deed the donee had occasionally transacted business for the donor, and that he had during the last sickness of his uncle, the general management of the farm, but that this was done under the general directions of the donor, it was Held:

1st. That the evidence did not show that the relation was such as to imply *dominion* or *control*, either over the *property* or the *person of the donor*. On the contrary, it was a relation which one might naturally expect to arise from near kinship and mutual affection.

2nd. That the testimony of the person who had been for years the donor's legal adviser, and who stated that fearing certain changes made in his will, and the execution of said deed, might give rise to controversy, he entered into a general conversation with the donor in regard to his business, the nature and extent of his property, the number of his relations, and then in regard to farming matters, news of the day, &c.; upon all of which he talked intelligently, showed beyond all question that the donor understood fully the nature and extent of the act in question, and was perfectly competent to make a deed or any other contract.

3rd. That while there were facts in the case calculated to create a strong suspicion against the good faith of the transaction, yet when considered in connection with other facts in the case, they were not sufficient to justify a condemnation of said deed as being procured by fraud or undue influence.

4th. That a voluntary gift made under the circumstances detailed in the evidence by a *capable donor, in pursuance of a long cherished purpose, to a favorite nephew* whom he had raised from childhood, and

with whom he had lived on the most intimate and affectionate terms, negatived the suspicion of fraud and undue influence; and a Court ought not to set aside a deed made under such circumstances, except upon proof of the strongest and most conclusive character.

5th. That the term "undue influence" as used in this connection, means a deed executed in pursuance of suggestions made by others, and not one made upon the suggestions of the donor himself, and in pursuance of well settled and often declared purposes.

APPEAL from the Circuit Court for Washington County, in Equity.

This appeal is taken from the decree of the Court below, (PEARRE and MOTTER, J.,) dismissing a bill filed by the appellants against the appellee. The case is stated in the opinion of the Court.

The cause was argued before BARTOL, C. J., BRENT, MILLER, ALVEY and ROBINSON, J.

*Louis E. McComas* and *Henry H. Keedy,* for the appellants.

*F. M. Darby* and *H. Kyd Douglas,* for the appellee.

ROBINSON, J., delivered the opinion of the Court.

This bill is filed to set aside a deed of gift made by John Reynolds to his nephew, John Henry Reynolds.

The undisputed facts show that the donor was unmarried and over seventy years of age, and in an extremely feeble condition of health.

At the time of the execution of the deed he was, and for several months prior thereto had been, confined to his room, suffering great bodily pain from an attack of dropsy, and from the effects of which he shortly afterwards died.

He had three sisters living, two of whom were poor and in needy circumstances, and nieces and nephews of two sisters deceased and one deceased brother.

In November, 1878, he made three wills, in each of which he gave legacies to his sisters and other relatives, varying in amount from ten to twelve thousand dollars; and in each of which he left his nephew, John Henry Reynolds, *executor* and *residuary legatee.*

In December following, he made an assignment to the said John Henry, of certain personal property, embracing horses, cattle, crops and farming implements; and on the 13th of January he made the deed now assailed, by which he conveyed to the donee, subject to a life estate in the donor, a tract of land containing two hundred and sixty acres, and valued at twelve to fifteen thousand dollars.

The property belonging to him, and not embraced in the assignment of December, and the deed now in question, was altogether insufficient to pay the legacies under his will.

The bill charges that the donor was incompetent to make a valid deed or contract, and that the deed of January 13th was obtained by fraud and undue influence practiced and exercised by the donee.

A good deal was said in argument about the relations existing between the donor and donee, and it was insisted that they were of such a character as to bring this case within the well recognized principles of a Court of equity, as applicable to gifts between persons standing in a confidential and fiduciary relation to each other. The proof, however, does not in our opinion justify this contention. It does show that the donee was the favorite nephew of the donor, that he had lived with his uncle from his earliest childhood, and that the most affectionate relations existed between them. It shows also, that for several years prior to the deed, the donee had occasionally transacted business for the donor, and that he had during the last sickness of his uncle, the general management of the farm. But it shows also, that this was done under the general directions of the donor.

It does not show that the relation was such as to imply *dominion* or *control* either over the *property* or *person of the donor*. On the contrary, it was a relation which one might naturally expect to arise from near kinship and mutual affection. At the same time we deem it proper to say that in view of this close and intimate relation, the age and infirmity of the donor, the nature and character of the gift, the fact that in each of the three wills just preceding the deed in question, the donor recognized his sisters and other relatives as objects of his bounty, a Court cannot be too vigilant and cautious in considering the proof, and in determining whether the gift was the free, voluntary and intelligent act of the donor.

We come now to consider the proof upon which the deed of January 13th is assailed; and first in regard to the capacity of the donor to make a valid deed or contract.

Quite a number of witnesses, not less than ten, most of whom had known the donor intimately for years, do not hesitate to say that in their opinion, he was at the time of the execution of this deed, incapable of making a valid contract, or an intelligent disposition of his property. The reasons upon which this opinion is founded, are not, it is true, in some cases very satisfactory, being, to some extent at least, based upon his great bodily infirmities and sufferings.

It would extend this opinion far beyond what is necessary, to review in detail the testimony of the several witnesses on this subject; but if the case rested solely upon their testimony, we should be obliged to say that the deed in question was not the act of an *intelligent and capable person.*

But against this, we have the testimony of not less than twenty witnesses, the friends and neighbors of the donor, who had known him for a long number of years, who saw him frequently during his last illness, both before and subsequent to the execution of the deed, all of whom say

Eakle, *et al. vs.* Reynolds.

that although broken down by disease, and suffering great bodily pain, the donor was in the possession of his faculties, and fully competent to execute a deed or contract. They detail, too, conversations with him during this time on a variety of subjects, in regard to business matters, current news of the day, farming, crops, &c., all of which show conclusively that whatever may have been his bodily infirmities, his mind was clear.

And in addition to these, we have the testimony of Mr. Syester, who had been for years his legal adviser, who prepared the three wills in November, and the deed now in question, and to whom the donor assigned the reasons which induced him to make the several changes in his will, and the reasons by which he was influenced and governed in making the deed of 13th January. It is unnecessary to state in detail the conversation between Mr. Syester and the donor; it shows, however, that the latter was in the full possession of his faculties and understood thoroughly the business in which he was engaged. In regard to the legacies under his will, he said "he was afraid they would be considered in law as charges upon his land, and that his nephew, John Henry, would be obliged to sell part of the farm to pay them, and this he wanted to avoid." He then proposed that Mr. Syester should prepare a deed of the farm to his nephew, reserving to himself a life estate.

The witness further says, that fearing these changes in his will, and the execution of the deed, might give rise to controversy, he entered into a general conversation with the donor in regard to his business, the nature and extent of his property, the number of his relations, and then in regard to farming matters, news of the day, &c., and upon all of which, the donor talked intelligently.

And when the deed was prepared by witness and about to be read, the donor requested John Beeler, who was present, to read the original deed, for the purpose of ascer-

taining whether the two deeds corresponded in metes and bounds, courses and distances.

The conversation between Mr. Syester and the donor shows beyond all question that the latter understood fully the nature and extent of the act in question, and was perfectly competent to make a deed or any other contract. And to this, we have the testimony of Doctor Grimes, who had been the family physician for a number of years, and who attended him during his last sickness.

The only remaining question then, is whether the deed of January the 13th was the *free and voluntary act of the donor*, or whether it was procured by fraud and undue influence? And upon this branch of the case there are, we must confess, some very suspicious circumstances. Here is an old man broken down by age and disease, making no less than three wills within a month, and in each succeeding will, the change is always in favor of the appellee. Within two weeks after the last will is signed, we find him conveying a large portion of his personal property to the appellee, and within a month after this, he makes the deed of January 13th, by which the appellee gets the farm, and thus there is but little left to pass to the legatees under his last will. During all this time the appellee is living in the same house with the donor, and is not only aware of the preparation of these papers by which he was to get nearly all of his uncle's property, but shows some anxiety about their execution.

These facts, we say, are calculated to create a strong suspicion against the good faith of this transaction, but yet when considered in connection with other facts in the case they are not sufficient to justify us in condemning this deed as being procured by fraud or undue influence. All the witnesses agree in saying that the donor was a man of sound judgment, strong convictions, and of firm and resolute purpose. They prove also that whatever may have been his affection for his sisters and other relatives,

the appellee, whom he had raised from his earliest child-hood, was the one nearest and dearest to his heart. He was, too, the son of his favorite brother, with whom the donor had lived a number of years, owning and shar-ing all property belonging to them in common.

As far back as 1873, he had declared to the witness, Burtner, that he intended to keep the farm in the Rey-nolds' name, and that he intended to give it to his nephew, the appellee.

He told Mr. Syester in 1874, "that a large part of the property owned by him was the result of the joint labors of his brother William, the father of the appellee, and himself, and that he thought William's interest ought to go to his son, John Henry, and that he intended his part should go to him also."

To William Jones he said, in February, 1877, "that he intended to give everything he had to John Henry, and that he would do it then if it was not for throwing him-self out of a home."

In the same year he told Dr. Grimes, his family physi-cian, "that he intended to make a deed of his property to John Henry," and in the next year, to the same wit-ness, he said, "he was going to give him the home farm, and would do it then, but was afraid he might outlive him."

He said the same thing, in 1877, to John H. Beeler, and in the same year he told Jonathan Stine "he intended to give to John Henry the home farm and the personal property on it."

A *voluntary gift* thus made by a *capable donor in pursu-ance of a long cherished purpose, to a favorite nephew* whom he had raised from childhood, and with whom he had lived on the most intimate and affectionate terms, nega-tives the suspicion of fraud and undue influence; and a Court ought not to set aside a deed made under such cir-cumstances, except upon proof of the strongest and most conclusive character.

The term, undue influence, as used in this connection, means a deed executed in pursuance of suggestions made by others, and not one made upon the suggestions of the donor himself, and in pursuance of well settled and often declared purposes.

The donor in this case was no doubt desirous of making some suitable provision for his sisters and others who were the natural objects of his bounty, but this desire was subordinate to the long cherished purpose of making what he considered an ample provision for his nephew, the appellee.

This *paramount purpose* explains the changes in his will, and also the motives by which he was governed in making the deed of the 13th of January.

For these reasons the decree below will be affirmed.

*Decree affirmed.*

