EMMA G. BERGER vs. MARY H. BULLOCK, AND MORTON Y. BULLOCK, TRUSTEES, AND OTHERS.

*Cancellation of a Deed Obtained by Fraud—Effect of Failure of a Party to a Cause to Deny Charges of Fraud.*

A widow, whose husband had bequeathed to her all of his property, which was small in amount, was induced by threats of a contest concerning the will and of a suit for slander made by her daughter-in-law, and by false statements made by her son, to execute a deed conveying all the property in trust to her daughter and son-in-law. *Held*, upon the facts, that the deed was procured by fraud and should be annulled.

Where charges of fraud are made against a party by the pleadings and evidence in a cause, his failure to deny them or to testify in the case, although a competent witness, is an admission of the truth of the charges.

Appeal from a decree of Circuit Court No. 2, of Baltimore City (HARLAN, C. J.), dismissing the bill of complaint in this case.

The cause was argued before McSHERRY, C. J., FOWLER, PAGE, BOYD and RUSSUM, JJ.

*Wm. Pinkney Whyte* and *Joseph Whyte* for the appellant.

*Edgar Allan Poe* (with whom was *John P. Poe* on the brief), for John G. and Georgianna Berger, appellees.

*Robert H. Smith* and *Harry N. Abercrombie* filed a brief for Mary H. and Morton Y. Bullock, appellees.

McSHERRY, C. J., delivered the opinion of the Court.

The bill of complaint filed in this case seeks to have a deed of trust executed by the appellant to her daughter and her daughter's husband vacated and annulled on the ground that it was procured by fraud and misrepresentation, and,

consequently, was not the free, voluntary and deliberate act of the grantor.    This is the single question in the case.

Generally it is not easy to prove fraud.    Often its presence is intuitively felt rather than made visible, as the means resorted to for the accomplishment of its designs are frequently remote and seemingly trivial.    Sometimes negative circumstances are quite as cogent in manifesting its influence, as are affirmative and direct statements.    In every investigation involving a charge of fraud explicit denials may usually be expected from those against whom the accusation is made, though such denials are of little avail when confronted by and contrasted with conditions which observation and experience teach are the accustomed badges of guilt.    But when the charge is distinctly made and is not denied by one, who, if innocent, could truthfully repel it, his silence, when he ought to speak, becomes, if not convincing, at least persuasive evidence of the bad faith imputed to him.

The record before us is not voluminous ; the amount involved is not large, and the facts are comparatively few. The appellant is a widow with two grown children—one a son, the other a daughter—and both are married.    Her husband died in the fall of eighteen hundred and ninety-five, leaving to her by his will all the property he possessed, and this was not great in value.    Shortly afterwards the son's wife made threats that she would contest the will, and these threats caused the appellant considerable solicitude. The son went to his mother's home and asked her to allow him to board there for a couple of weeks, as he had been compelled to leave his wife because she wished to break his father's will ; and it was then, for the first time, suggested by the son that his mother should execute a deed of trust.    This was the beginning of the ultimately successful scheme.    The pretended separation of the son from his wife was a plan invented to excite the mother's sympathy and to gain her confidence ; and the threat that the daughter-in-law, who could have had no standing in a Court of jus-

tice to attack the will, would assail it was manifestly re-
sorted to for the purpose of deluding the appellant into
making the deed—for the making of the deed was suggested
by the son as the means of preventing an assault on the
will.   The unguarded declaration of the son to the witness
Johnson that he, the son, had gone home to stay "until
he made his scheme," leaves no room to doubt as to the
motive that prompted him to sham a separation from his
wife, to take up his abode with his mother, and finally to
urge the execution of the deed upon a pretext that was as
shallow as it was sinister.   Stay at her house he did until
the deed was finally executed, when he returned to his wife.
Being disquieted by these threats of a contest she consulted
her counsel, Mr. Lucas, and she was told by him that the
daughter-in-law could not attack the will, and no deed was
then made.   The *caveat* device having failed another was
at once resorted to, and it was this : The daughter-in-law de-
clared that she would sue the appellant for slander, and would
strip her of all her property.   The appellant was beset with
a fear that this new threat inspired, and her son, the hus-
band of the woman who menaced her with impoverishment
and want, advised her to make her property over in order
that it might be placed beyond the reach of his wife and
protected from seizure for damages.   The appellant de-
clared that she was " in mortal fear of losing" her property.
She was told by the son that his wife had the suit ready to
file, and then it was she says that " for fear of losing my
property I went and made the deed."   The appellant's state-
ments, as just outlined stand without a word of contradic-
tion from any one.   The son, though a party to the cause,
and though a competent witness, gave no testimony at all
and did not venture to go on the witness stand.   His fail-
ure to deny what was thus imputed to him, when it was his
duty to speak, was an undoubted admission of the truth of
the charges made against him.   His silence was a confes-
sion of his guilt.   *Hiss* v. *Weik*, 78 Md. 439 ; *Zimmerman*
v. *Bitner*, 79 Md. 128.

That this fear, thus inspired by the son's wife through the agency of the son, influenced the appellant and induced her to execute the deed is beyond cavil or controversy. This is conspicuously apparent on nearly every page of the record. " He told me," says the appellant, " if I wanted to save myself I had better make it, as I had very little, and he didn't want to see it taken away from me ; I went to Mr. Lucas then and told him my son's wife was going to sue me ; he said, Mrs. Berger, you don't seem to know what you want, and I told him I wanted it made right away to save myself." This, though not recollected by Mr. Lucas, is not explicitly denied by him. The pretence that the son did not wish to see his mother's property taken away from her by his own wife in a suit for slander, and the further pretext that he was actually intervening between his wife and his mother for the latter's protection against the former, were studied and systematic steps in the scheme to extort the deed and thereby to deprive the mother of the full and unconstrained dominion over her own estate ; with the management and disposal of which her husband had but a few months previously absolutely entrusted her. One, at least, of the motives which induced this unfilial conduct on the part of the son was an apprehension that if the mother were left in the control of her property, she would, in disposing of it, entirely cut him off. The evidence of this will appear in a moment. After a deed of trust had been written it proved not to be satisfactory to the *son-in-law*, because, as he says, " it left her to will that property as she pleased," and the son-in-law thought she might exclude the son—a result which the *son-in-law* wished to prevent. Accordingly, without consulting the appellant, another deed was prepared conforming to the views of the son-in-law, whose judgment as to the ultimate disposal of the property was substituted for hers, and the property was in the second deed limited over, after the appellant's death, to the son and daughter ; and the deed containing that provision is the one the appellant eventually

signed, without knowing, so she declares, what its contents really were. When she did discover what the provisions of the deed were she expressed her intention, in the presence of two disinterested witnesses and her son, to revoke the deed and to re-possess the property ; but the son said to her : "I see you getting it, for I've felt the sting of poverty once and I don't intend to let this thing slip through my fingers." The deed being assailed by the grantor under the pending proceedings, begun thirty-seven days after the date of the deed, the son, whose fraudulent conduct was chiefly instrumental in procuring the instrument, refrained, as we have said, from going on the witness stand, and failed to repel a single one of the serious accusations made against him ; but the son's wife, who had threatened to bring suit for slander, and who, had she been serious or sincere in this respect, would have been anxious to have the deed set aside (because so long as it stands it interposes an obstacle to the satisfaction of any judgment she might obtain), singularly enough, appeared as a witness to sustain and support the deed. Inconsistency so flagrant as this cannot be explained upon any hypothesis of good faith, but is in perfect keeping with the sinister methods by which the instrument was procured.

It appears from the testimony of Mr. Lucas, who drew the deed, and who seems to have acted throughout purely from motives of friendship, that he had been spoken to about a deed of trust by Bullock, the son-in-law, during February, eighteen hundred and ninety-six, but that the first interview which he had with Mrs. Berger on the subject was in March following. She offered to make him the trustee, but he suggested the daughter and the daughter's husband, and without any instructions from her relative to the terms of the trust, and without other statement than that she had concluded to execute a deed of trust, a deed was prepared. Mr. Lucas did not read it over to her, and does not intimate that she gave any directions as to what disposition was to be made of the property by the deed.

It is very apparent when his and Bullock's testimony are considered together, that Bullock and not Mrs. Berger dictated the details of the deed. Perhaps it was a knowledge of this that induced Mr. Lucas to say to Bullock or John Berger, after the deed had been executed, that he thought the deed would not stand. The only witnesses who pretend that the deed was read to Mrs. Berger are Bullock and his wife, and in this they are contradicted by Mrs. Berger.

That the appellant requested Mr. Lucas to prepare a deed of trust is true beyond dispute. But whether she knew what she had done or proposed to do by that request is not so much a matter of consequence as is the ulterior inquiry, how the intention to do what she did do was produced. Though she knowingly executed a deed of trust and intended to execute one, still if that intention was brought about by fraud, misrepresentation and deception, the deed so produced was no more her free and voluntary act or choice than if the instrument had been executed under the dominion of coercion, directly in antagonism to her expressed intention. The person who, of all others, could have most effectually denied the exertion of the sinister methods and influence attributed to him, remained stolidly silent, except when he proclaimed in advance his design "to make his scheme," and asserted afterwards his purpose not to let the fruits of his consummated plan slip through his fingers. That the intention on her part to make the deed resulted directly from the devices of her son and her son's wife; and that the terms of the deed were dictated by her son-in-law, and not by herself, are facts about which the evidence leaves no room for controversy. If this be so, upon what principle can the deed be upheld?

Were her testimony unsupported, or were it questioned by disinterested witnesses, we should hesitate to strike the deed down as the case is now presented. But her statements are corroborated in a most satisfactory manner by the failure of the chief conspirator to deny or dispute the accusations made against him. Whilst Courts ought to be slow

in setting aside, at the instance of the grantor, a conveyance seemingly made with deliberation, they would fall far short of their plain duty if they failed to rip up and annul an instrument executed by a person whose intention to make it has been brought about by such deception and fraud as this record discloses. We cannot sustain this deed without giving sanction and countenance to the reprehensible means that were resorted to in procuring it. We must, therefore, reverse the decree appealed from and remand the cause, that a new decree may be passed conformably to this opinion.

> *Decree reversed with costs above and
> below, and cause remanded.*

(Decided April 1st, 1897).