BERTHA J. McGILL, EXECUTRIX *v.* HENRY A. NICHOLS ET AL.

HENRY A. NICHOLS ET AL. *v.* BERTHA J. McGILL, EXECUTRIX.

[Nos. 37, 38, January Term, 1929.]

*Decided April 25th, 1929.*

The causes were argued before BOND, C. J., PATTISON, URNER, OFFUTT, DIGGES, and PARKE, JJ.

*Wm. Mason Shehan* and *G. Elbert Marshall,* with whom were *Shehan & Marshall* on the brief, for Bertha J. McGill, executrix.

*H. H. Balch* and *Edward H. Burke,* with whom were *E. T. Miller* and *Bowie & Burke* on the brief, for Henry A. Nichols and others.

PATTISON, J., delivered the opinion of the Court.

Michael B. Nichols of Easton, Md., died on October 23rd, 1923, leaving an estate consisting of real and personal property worth from sixty to seventy thousand dollars, and leaving as his only heirs-at-law his widow, Kate F. Nichols, and two brothers, Henry A. and Thomas C. Nichols, surviving him.

Michael B. Nichols for some time prior to his death had been in poor health and was confined to his home. In October, 1923, only a few weeks before his death, he had a will prepared, but died before he executed it. This unexecuted will contained a number of legacies and specific bequests and devices, all of which we need not mention, but among them are found: (1) the devise to Thomas C. Nichols of a home and lot on Glenwood Avenue, Easton, Md.; (2) a devise to Henry A. Nichols in trust for Amelia, the daughter of Henry A. Nichols, of a house and lot adjoining the one devised to Thomas C. Nichols; also a lot or parcel of wood land containing forty acres, more or less, in Easton District, Talbot County, Md., which was conveyed to Michael B. Nichols by Perry S. Messick and wife; (3) a devise to his widow, Kate F. Nichols, for and during her natural life, of his home or residence on Goldsborough Street, Easton, Md., with the furniture and equipment therein, which, upon her death, was to go to M. Tilghman Johnson and Henry A. Nichols, in trust, to be sold by them, and one-half of the net proceeds therefrom was to be paid by them to the Trustees of Sts. Peter and Paul Church, Easton, Md. and the other one-half of such proceeds was, by said unexecuted will, to become a part of the residue of his estate. The rest and residue of his estate, both real and personal, is then disposed of as follows: "I give, devise and bequeath to M. Tilghman Johnson and Henry A. Nichols in trust to collect the rents, issues and profits therefrom and apply the same first to the

payment of all taxes and other expenses incident to the management of said property and afterward to pay the net rental or income therefrom to my wife, during the term of her natural life. At my wife's death said trust shall cease, and my trustees or their successors in the trust shall pay over said residue of my estate to my brothers Henry A. Nichols and Thomas C. Nichols, absolutely, to be equally divided between them."

A few days after the death of Michael B. Nichols, upon the invitation of Kate F. Nichols, his widow, Henry A. and Thomas C. Nichols met at her home, and with them were other members of the Nichols family. At that time the will was read and it was then and there agreed by them that the wishes of Michael B. Nichols, as disclosed by the provisions of the will, should be carried out. Whereupon a written agreement was executed by Kate F. Nichols and Henry A. and Thomas C. Nichols, dated the —— day of October, 1923. It will be found that this agreement differs in parts from the provisions of the will. By the will the Messick wood lot was devised to Henry A. Nichols, in trust for Amelia, his daughter, when, by the agreement mentioned, it was to be conveyed to him absolutely. This, however, was corrected by a subsequent agreement made on the —— day of November, 1923; and in the will, both M. Tilghman Johnson and Henry A. Nichols were made trustees, while, in the agreement, Henry A. Nichols alone was made trustee.

The second agreement, of the — day of November following, which we have already referred to, was made, as stated by Henry A. Nichols, at his instance and request, for the purpose of curtailing or restricting the power conferred upon him by the first agreement, by making it necessary for him, as trustee, to get the consent and approval of the heirs of Michael B. Nichols before making any sale of any part of the corpus of the estate, and also requiring him to give bond for the faithful performance of his duties as such trustee; and it contained the further provision that the specific legacies named in the will were not to be paid until after the

death of Kate F. Nichols, without her consent and the consent of the heirs of Michael B. Nichols, and the execution of the second agreement was attested, while the first was not. This second agreement when executed took the place of the first agreement and was in lieu thereof.

On the 19th day of January, 1924, the house and lot, which under the will and agreement was to go, or be conveyed, to Thomas C. Nichols, was conveyed to him, though in the description thereof it is not described as being on Glenwood Avenue, though we assume this was the lot intended. And on the said 19th day of January, 1924, the house and lot, which in the will and agreement was to go, or be conveyed, to Henry A. Nichols, trustee, for his daughter Amelia, was so conveyed to him as trustee, and with it was conveyed a wood lot, though not the wood lot described in the will or agreement which was to go, or be conveyed, to her father in trust for her.

It was also agreed between the parties that letters of administration upon the personal estate of Michael B. Nichols should be issued to both Kate F. Nichols and Henry A. Nichols, and not to Kate F. Nichols alone, as provided for by the will.

On the 16th day of September, 1924, a distribution was made in the orphans' court of the personal property of Michael B. Nichols, deceased, in which the sum of $9,597.59 was distributed to Kate F. Nichols, and one-half of said sum to Henry A. and Thomas C. Nichols each, less the collateral tax upon each of their shares.

Thereafter, on the 20th day of November, 1924, a deed of trust was executed by Kate F. Nichols, Henry A. Nichols, Florence Nichols, his wife, and Thomas C. Nichols and Katherine B. Nichols, his wife, in which it is said the grantors "are desirous of disposing of the property and estate of said decedent in accordance with his wishes, and for the purpose of carrying said wishes into effect, these presents are executed." By this deed, the grantors granted and conveyed unto Henry A. Nichols in trust "for the uses and purposes hereinafter provided, all that real estate and personal property, situate, lying and being in Talbot County,

State of Maryland," described therein; which, it would seem, included all the land of which Michael B. Nichols died seized and possessed, except the lands conveyed unto Thomas C. Nichols absolutely, and to Henry A. Nichols, in trust for his daughter, and in the grant the personal property is included, and is alluded to as "being the same property distributed to Kate F. Nichols, widow; Henry A. Nichols and Thomas C. Nichols, brothers of Michael B. Nichols, deceased, in the distribution account passed in the estate of Michael B. Nichols in the Orphans' Court for Talbot County." In the *habendum* clause it is said:

"To Have and To Hold the above granted property unto the said Henry A. Nichols and to his successors forever, in fee simple; in trust and confidence, nevertheless, for the following uses and purposes, that is to say:

"To collect the rents, profits and income issuing from or arising out of the above granted property, and after paying all taxes, charges and expenses upon said property, together with the expenses of this trust, including a commission to himself of ten (10) per cent. upon said rents, profits and income; to pay over the net balance therefrom or so much thereof as she may desire to Kate F. Nichols, for and during the term of her natural life and to permit the said Kate F. Nichols during her lifetime to occupy the residence on the corner of Goldsborough and Aurora Streets, Easton, Maryland, and to use the furniture and household effects therein contained, free of any rent or charge whatsoever."

It then directs the trustee, after the death of Kate F. Nichols, to sell the home property on Goldsborough Street and to pay over one-half of the net proceeds therefrom to the Trustees of Sts. Peter and Paul Church, Easton, Md., and of the remaining one-half they were to pay legacies and specific bequests found in the will; and "the balance of the one-half of such proceeds of such sale then remaining, together with all other cash, securities, real and personal property constituting the said trust, to be paid over, deliv-

ered, transferred, granted and conveyed" by the said trustee or his successors to Henry A. Nichols and Thomas C. Nichols, absolutely, share and share alike, or to their heirs *per stirpes,* free and discharged from said trust.

Henry A. Nichols qualified as trustee under the deed, and took over the management of the trust estate, when, on August 26th, 1927, Kate F. Nichols filed her bill against Henry A. Nichols and the other beneficiaries under the deed of trust, in which she alleged in substance: That "she had led a sheltered and protected life," and was not familiar with business methods and with the management of property. Her husband, so long as he was able, looked after his business affairs, but when he became sick and unable to do so, this duty fell upon her, and in the performance of that duty, she "was dominated by the advice, counsel and direction of her brother-in-law," Henry A. Nichols, upon whose judgment and advice "she felt she had a right to rely and did entirely rely upon such advice and counsel." After the death of her husband, Henry A. Nichols "professed the greatest affection, concern and solicitude for her and her welfare," and "began to persuade and influence her to execute a deed of trust to him, alleging that it was her husband's will or wish" that the property should be disposed of as shown by the deed of trust thereafter executed, and that in so doing it would be to her advantage, as she would thereby be provided with a comfortable livelihood and maintenance so long as she lived. That relying upon these representations, by which she was misled, and not knowing the legal consequences of her act in executing said deed of trust, she signed the same. That because of its execution she was prevented from "applying the principal of the estate, to which she was entitled, to her absolute needs and requirements," and as a result thereof she "has suffered great hardship and now finds herself in a state of abject poverty," resulting from the costs and expenses incident to a severe illness suffered by her. She further alleged that she was induced to sign the deed of trust because of the undue influence exerted upon her by Henry A. Nichols, "depriving her

of her free will, judgment and discretion." The bill further alleged "that in pursuance of said deed or declaration of trust, the said Henry A. Nichols entered upon the administration of the trust therein provided, and took possession of the aforesaid properties of said Michael B. Nichols, and has undertaken to manage and administer the same, and that large sums of money have gone into his hands and have been expended by him, the correctness of such receipts and expenditures of the administration of said trust your petitioner has not full and complete information." That Henry A. Nichols, trustee, since assuming the trust reposed in him, has delivered to the plaintiff but two accounts of the receipts and expenditures by him, and that she is "advised and charges that there are numerous items and charges in said account that were improperly made," and she insists that a further accounting shall be had. The bill then concludes with the following prayer: "That the said pretended Deed or Declaration of Trust may be annulled and set aside by decree of this court." "That a full and complete accounting be had of all receipts and expenditures while the said Henry A. Nichols has been in control and management of the said properties of which the said Michael B. Nichols died seized and possessed."

Answers were filed to the bill by all the defendants thereto except William Temple and the Trustees of Sts. Peter and Paul Church of Easton, Md. In the answer of Henry A. Nichols and Thomas C. Nichols, and their respective wives, the substantial or material charges of the bill are denied by them.

Kate F. Nichols, after testifying in the case, died during the pendency of the suit, and Bertha J. McGill, her executrix, sole legatee and devisee, was made party plaintiff thereto.

A large volume of evidence was taken before the court, and, after argument thereon, the court passed its decree in which it refused to annul and set aside the deed of trust as prayed for in the first prayer of the bill, but held that the plaintiff, Bertha J. McGill, was "entitled to an accounting

in said cause between herself as executrix of Kate F. Nichols, her deceased testatrix, and said Henry A. Nichols individually and as trustee under said deed of trust," and it directed that such accounting should be had and made as therein stated, and for such purpose the bill was retained. In the imposition of costs the court decreed that the plaintiff should pay one-third of the costs and the other two-thirds should be paid by Henry A. and Thomas C. Nichols.

The plaintiff, Bertha J. McGill, appealed from that part of the decree in which the court refused to set aside and annul the deed of trust, and the defendants, Henry A. Nichols and Thomas C. Nichols, appealed from that part of the decree which directed an accounting to be made by Henry A. Nichols, trustee. There is, therefore, in this case, two appeals in one record.

In cases where there is a confidential relation, within the legal meaning of that term, existing between the donor and donee, or grantor and grantee, there is a presumption that the gift or grant is void, and the well settled rule is that, in such cases, the burden of proof is upon the donee or grantee to prove to the satisfaction of the court that the conveyance was the free, deliberate, and voluntary act of the donor or grantor, and made by him with full knowledge as to its effect and operation; in other words, that he knew that the conveyance itself operated to divest him of all title to the property and to vest it in the donee or grantee. *Todd v. Grove,* 33 Md. 195; *Pairo v. Vickery,* 37 Md. 467; *Williams v. Williams,* 63 Md. 405; *Whitridge v. Whitridge,* 76 Md. 54; *Bauer v. Bauer,* 82 Md. 242; *Reed v. Reed,* 101 Md. 146; *Henry v. Leech,* 123 Md. 440. And, as was said in *Zimmerman v. Bitner,* 79 Md. 115, "a good deal has been said as to what constitutes a confidential relation within the operation of the principle, but courts have always been careful not to fetter the operation of the principle by undertaking to define its precise limits. The cases of parent and child, guardian and ward, trustee and *cestui que trust,* principal and agent, are familiar instances to which the principle applies in its strictest sense. But its operation is not confined

to the dealings and transactions between parties standing in these relations, but extends to all relations in which confidence is reposed and in which dominion and influence resulting from such confidence may be exercised by one person over another."

A voluntary gift or grant from one to her brother-in-law, as in this case, is not within the class of cases above referred to, and the confidential relations between the parties must be shown to actually exist from the facts of the case. In this case, it would be rather difficult to find from the evidence that there was a confidential relation existing between Kate F. Nichols, the grantor, and Henry A. Nichols, the grantee, at the time of the execution of the deed of trust, and it was then, as alleged in the bill, that Henry A. Nichols, the grantee, committed the wrong complained of, that is, obtained the signature of Kate F. Nichols, his brother's widow, to the deed of trust, by the exercise of undue influence. The bill alleges that Henry A. Nichols, the grantee, dominated her in the management of her husband's business affairs, while the latter was sick, for a short time only before his death, and that he, after his brother's death, "professed the greatest affection, concern and solicitude for her and for her welfare." It is upon these alleged facts that the claim is made that a confidential relation existed between them at the time of the execution of the agreement entered into by them in October, 1923, only a short while after the death of her husband, the provisions of which, with the changes mentioned, were incorporated in the deed of trust, made about a year thereafter.

There is no evidence that Henry A. Nichols dominated Kate F. Nichols during the period of her husband's illness, and, while there is evidence that he was on friendly terms with her, both before and after the death of his brother, and may have told her of his "affection, concern and solicitude for her and for her welfare," it can hardly be said that upon these facts a confidential relation, within the meaning of the term, existed between them. But if we assume, without deciding, there was a confidential relation between them,

Henry A. Nichols has, we think, met the burden imposed upon him.

The unexecuted will of Michael B. Nichols, to which we have referred, was drafted by M. Tilghman Johnson, a highly reputable attorney of the Easton bar, at the request of Michael B. Nichols. Mr. Johnson was sent for by him to come to his home, and while there he received from Michael B. Nichols directions as to how he wished to dispose of his property. He then returned to his office, prepared the will and, some days thereafter, returned to the home of Michael B. Nichols. In this will Michael B. Nichols bequeathed a legacy to the Roman Catholic Church of Easton, but there was some uncertainty in his mind as to the exact way it should be done, and it was decided to delay the execution of the will until Bishop Monaghan of Wilmington could be communicated with and the information obtained. In addition to this there were one or two other changes he wished made in the original draft. Mr. Johnson, as he testified, either left at the home of Michael B. Nichols a copy of the original draft with a lead pencil memorandum thereon, showing the changes to be made therein, or he, after hearing from Bishop Monaghan, rewrote the will and sent it to Michael B. Nichols. The draft of the will, now appearing in the record, was shown to Mr. Johnson, and he identified it as the one written by him at the request of Michael B. Nichols. Mr. Johnson also wrote the first agreement of October, 1923, as well as the second agreement of November, 1923. He was asked to write these agreements by Henry A. Nichols, and they were written by him from the will with the changes therein already mentioned.

Henry A. Nichols testified, in reference to the agreements mentioned, that, a few days after the death of his brother Michael B. Nichols, Kate F. Nichols, his brother's widow, said to him, "Henry, I would like to have the will (meaning the will of her husband) read before all, especially before Harry goes back to Chicago." He suggested that any time would suit him that would suit her, and for her to name the time and he would get them together and have

them there. She named seven or eight o'clock the following evening. On that evening, he, with his daughter Amelia, and his brother Thomas, and Harry, the son of Thomas, met at the home of the widow. Henry testified that Kate F. Nichols said, "Henry, here is Mike's will and I want you to read it before them all," and he read it. It was, he said, the first time he ever saw it, or knew the contents of it. He was asked what became of the paper he read, and he said he could not say positively, but he thought he handed it back to her. After it was read, Mrs. Kate Nichols said: "Those are his wishes, that is his will, and I want to carry it out to the letter." There was something then said about having a contract signed by all, and Henry suggested that Mr. Johnson should be consulted and asked to prepare it, and he saw Mr. Johnson and had him write the contract, which was subsequently executed. Thereafter, a second agreement was drawn at Henry A. Nichols' request. His purpose for so doing has already been stated. Both of those agreements were executed at the home of Mrs. Kate F. Nichols. The first was not witnessed, but the second was attested by Mrs. Jeffrie Robert McGill, the substituted plaintiff in this case, a sister of Mrs. Kate F. Nichols, who at the time was at her sister's home, and was called to witness it.

Amelia Heikes, the daughter of Henry A. Nichols, who was present at the reading of the will, testified that Kate F. Nichols asked her father to read the will. She saw the paper when it was read by her father, but was unable to say who had it before he read it. When it was read, Mrs. Kate F. Nichols said: "Henry, they are Mike's wishes and I want them carried out to the letter." Thomas C. Nichols and his son Harry W. Nichols, who were also present at the reading of the will, did not testify. The testimony of Mrs. Kate F. Nichols was taken only a few days before her death, and at that time she was in a very weak physical condition, and, while her mind may not have been impaired thereby, though we are inclined to think it was, her physical condition, or the effect of the medicine administered to her, prevented her from making a full disclosure of the facts in a clear and in-

telligent manner, for which reason, unfortunately, very little can be gathered from her testimony.

About one year after the execution of the agreements, the deed of trust in this case, which is here sought to be set aside, was executed. It was prepared by Mr. T. Hughlett Henry, a prominent attorney of high standing of the Easton bar. Mr. Henry, when asked what were the circumstances that led up to the execution of the deed of trust, said: "My recollection is that I had given the deed to Mr. Henry A. Nichols several days before I went out to Mrs. Nichols' house for the purpose of having it executed, so that he could let Mrs. Nichols look it over; and, as I recall, she had the deed there when I went to the house. I think I called her on the telephone to find out when it might be convenient to see her. I went there with Miss Elma Fleming, a notary public. I think that Mrs. Nichols' sister, Mrs. McGill, met us at the door and told us that Mrs. Nichols would be in to see us, and shortly after that Mrs. Nichols came into the room. I do not think that Mrs. McGill remained in the room, but I am not positive on that point; but that is my recollection now. I am not positive that I read to Mrs. Nichols verbatim the descriptions of the several parcels of real estate; but, with that exception, I read the deed to her and explained it to her. As to the real estate, I told her the kind of property it was, whether it was a farm and the name of it, so she could identify the property. I also explained to her that this was a deed carrying out the agreement between herself, Henry A. Nichols and Thomas C. Nichols, which had been signed in November, 1923, and that she was conveying to Mr. Henry A. Nichols what she herself got, and Mr. Thomas C. Nichols was conveying his interest in the real estate and the personal estate that each received under the distribution account in the orphans' court to Mr. Henry A. Nichols as trustee, and that she would get the income that this property produced as long as she lived. I also told her that, when she died, her interest ceased, and that she could not dispose of it to any one and that, after the payment of the legacies mentioned, $1,000 to the church, $200 to the Orphans' Home, $200 to

the Old Women's Home, and other small ones, the property went to Mr. Henry A. Nichols and Mr. Thomas C. Nichols. After I explained it to her, I asked her if she understood the deed. She said that she did, and that that was what she wanted to do."

At the close of Henry A. Nichols' testimony in chief, he said: "I would like to make a statement about something I have not been asked about, the deed of trust, when it was written." The court gave him permission to make the statement, and he said: "When that deed of trust was written, when Mr. Henry had it completed, he read it over to me and said, 'Now, is that right?' I said, 'That is fine.' I said that all we were to do was on the paper, and I would take it out to Mrs. Nichols and let it stay there. I took it out there and sat down and read the whole deed of trust to her. She said, 'That is all right, it is exactly what we agreed to, and that is what we want.' I said to her, 'Now, Kate, you know that this is the last thing when it is signed. There was no will; and, without a will, you are entitled to one-half of the estate; but, when we sign this paper, that settles it.' She said, 'I know what it is all about,' and at that time she said, 'Henry, I could not do otherwise if I wanted to, and I would not promise Mike—he wanted to call a witness— that I would not carry it out until the last unless I was going to do so. That is what I want.' I said to her, 'Kate, I don't want you to sign it for several days. Take it and show it to your friends, or consult some one. This is the last thing and what we do is final.' She said, 'I know exactly what it is.' I said to her, 'I won't ask you to sign it for several days. You can consult with any one you want,' and I think she said, 'I don't want to consult with any one. I know just what that is, and it is just what I want done.' Then I left her, and she had it for several days before it was signed."

Miss Fleming, the notary public who took the acknowledgment to the deed of trust, and who attested the signatures thereto, was at the time of taking the testimony in the hospital, and was not able to be present and testify in the case.

As we have said, the evidence, as presented to us, sufficiently shows that the onus or burden of proof imposed upon Henry A. Nichols was met by him.

The evidence discloses that Mrs. Kate F. Nichols was a devoted wife, and was firm in her determination to carry out the wishes of her husband, in respect to the disposition of his property, even though she was the loser thereby. This desire was the controlling thought with her, and, when she was once informed of her husband's wishes, it would seem, no undue influence was required to induce her to carry them out.

The agreement as to the execution of the contracts was made or reached on the evening the will was read. The first of the written agreements was not at that time executed, and the second was not executed until the following month. Her sister, Mrs. McGill, was in the house with her, and she had ample opportunity to consult and advise with her, as well as with other members of her immediate family, as to any and all questions presented to her for her decision. She said nothing to them, nor did they to her, concerning the disposition of the property, but, as they said, left that to her alone.

Had the agreements not been made and the deed of trust executed, Mrs. Kate F. Nichols would have been entitled to one-half of her husband's estate, absolutely, while under the agreements and deed of trust she took nothing absolutely, except a few minor bequests, and took only a life estate in his property, after the conveyances to Thomas C. Nichols and Henry A. Nichols, trustee, but this, it seems, was the wish of the husband, as disclosed by the unexecuted will. The provisions of the deed of trust in some respects differ from the unexecuted will, but these changes, with one exception, were more or less unimportant, and might have been readily agreed upon by them, as stated in the evidence. The exception to which we refer is that Henry A. Nichols alone was named trustee, in the agreements and deed of trust, while both he and M. Tilghman Johnson were named in the unexecuted will. Henry A. Nichols attempts to explain.

this by saying that it was the wish of Mrs. Kate F. Nichols that M. Tilghman Johnson should not be one of the trustees, though selected by her husband, whose wishes she was so anxious to carry out. This is rather difficult to understand, yet, in the absence of any proof to the contrary, we must take it to be true; but, if its truth were not assumed, this fact alone would not warrant us in setting aside the deed of trust. Her consent to this change was first given in the execution of the agreements, and again twelve months thereafter, in the execution of the deed of trust, all of which she said she fully understood. Her consent to the disposition of the property as made by the agreements and deed of trust was not, we think, the result of undue influence exerted upon her by Henry A. Nichols, but was in consequence of a strong desire on her part to carry out the wishes of her husband.

The disposition of her husband's property in the manner stated was, we think, entirely satisfactory to her, and remained satisfactory to her, until the income from the property, as accounted for, failed to provide an amount sufficient to meet the increased demands upon her caused by her illness, necessitating expenditures for operations and hospital services. It was not until then that any dissatisfaction was expressed by her with reference to the disposition of the property.

As to the other question, the one of accounting, we altogether agree with the learned court below in holding that Henry A. Nichols should make an accounting of the receipts and disbursements, as provided for in the decree of the lower court. There is evidence sufficient showing the necessity for such an accounting.

We will therefore affirm the decree in each of the appeals, and remand the case for an accounting.

> *Decree in each case affirmed except as to costs and case remanded, costs in this court and the court below to be paid out of the residuary corpus of the estate of Michael B. Nichols, deceased.*