## MARGARET ABROMAITIS v. WILLIAM VINCENTY LIPINAITIS.

[No. 2, January Term, 1931.]

*Decided March 19th, 1931.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Abram C. Joseph,* with whom were *Daniel C. Joseph, Herman F. Levy,* and *Abner Saylor,* on the brief, for the appellant.

*Robert Biggs,* for the appellee.

PATTISON, J., delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court No. 2 of Baltimore City, dismissing the bill of complaint of the

appellant, Margaret Abromaitis, against the appellee, her
brother, William Vincenty Lipinaitis, asking that two deeds
to the appellee from Antosia Lipinaitis and Vincenty Lipi-
naitis, his mother and father, dated the 3d day of March in
the year 1916, be set aside and annulled.

On the 23rd day of March in the year 1914, Antosia and
Vincenti Lipinaitis conveyed unto their son, William Vin-
centy Lipinaitis, for "the sum of $500 and other valuable
considerations," as stated in the deed, five lots or parcels of
land, together with the buildings and improvements thereon,
at Curtis Bay, Anne Arundel County, Md. On the day the
deed was executed, an agreement was entered into between
his parents and William Vincenty Lipinaitis, by which the
latter agreed to pay unto them, "the sum of $35.00 per
month as a life income payable quarterly for the period of
their natural lives, together with a dwelling for their use
* * * and after the death of either one of them, the sum be-
comes reduced to $20 per month, payable quarterly * * *
that he should see to their support and maintenance during
their lives" and he was not to sell or dispose of any part of
the real estate conveyed to him by the deed from them with-
out their consent.

Thereafter, on October 2nd, 1915, Antosia and Vincenty
Lipinaitis filed a bill in the Circuit Court for Anne Arundel
County against their son, asking that their deed to him of
March 23rd, 1914, be annulled and set aside. The bill was
not answered and a decree *pro confesso* was passed against
the defendant, but on February 23rd, 1916, the proceedings
were dismissed by the plaintiffs thereto.

On the 3rd day of March, in the last-named year, William
Vincenty Lipinaitis and his wife Victoria conveyed unto
his mother and father four lots or parcels of ground, together
with the buildings and improvements thereon, of which it is
said, after being particularly described therein, that "all the
lots above described were conveyed to the said William Vin-
centy Lipinaitis, Jr., the grantor herein, by Antosia and Vin-
centy Lipinaitis, her husband, by deed, dated March 23rd,
1914." On the same day, March 3rd, 1916, the mother and

father reconveyed the three first described lots or parcels of land in the above-mentioned deed of March 3rd, to their son, "in trust upon the following covenants, conditions and limitations: To collect the rents and profits issuing out of the said property excepting No. 10 Cypress Street, which is hereto set aside rent free for the personal use and occupation by the said grantors * * * and apply the said rents and profits to the payment of all taxes, water rents and assessments * * * and necessary repairs and improvements and to pay the sum of thirty-five dollars each month to the said grantors during the remainder of their lives and after the decease of one of them to pay the sum of twenty dollars each and every month to the survivor during the remainder of his or her natural life, and to furnish to the said grantors and the survivor of them, free of all costs for their own use, two tons of coal for household use, and to apply the remainder of the said rents and profits to his own use as his compensation for executing the said trust. And after the death of the said survivor, then to have and to hold the said lots and premises unto the said William Vincenty Lipinaitis, his heirs and assigns in fee simple. In the event the said William Vincenty Lipinaitis shall pre-decease the said grantors or the survivor of them, then the trust hereby created shall terminate, and the properties hereinbefore referred to shall revert to and be held by the said Antosia Lipinaitis and Vincenty Lipinaitis, as tenants by the entirety their heirs and assigns in fee simple."

On the said 3rd day of March, 1916, another deed was executed by the mother and father, conveying the fourthly described parcel of land in the deed to them of that date, to their said son "in trust for the proper use and benefit of the said Antosia Lipinaitis and Vincenty Lipinaitis, her husband, during the remainder of their natural lives and after their death, to have and to hold unto the said Margaret Abromaitis, her heirs and assigns, in fee simple." The grantee took possession of the property granted to him by said deeds of March 3rd, 1916, and thereafter administered the trust thereby created to the death of his father on the 13th day

of January, 1929, his mother having previously died on the 2nd day of April, 1926.

On December 2nd, 1929, the appellant filed her bill against the appellee asking for the annulment of the deeds to him from Antosia and Vincenty Lipinaitis, dated March 3rd, 1916.

The bill alleged that the mother, Antosia, in whom the title to the property in question was vested, was in 1914 indicted on a criminal charge. Her son, the appellant, was away from home at the time, but returned in a few days, and told his mother "that she would go to the penitentiary, whether guilty or innocent, and all her property would be taken away from her," and, by constantly repeating this statement, he fraudulently induced her to execute the deed to him of March 23rd, 1914, conveying her lands to him. As alleged in the bill, upon the acquittal of the mother, she called upon her son to reconvey the property to her, which he refused to do, and, because of his refusal the proceedings in the Circuit Court for Anne Arundel County to set aside and annul the deed from her to him of the 23rd day of March, 1914, were instituted. It is then alleged that, while the proceedings in that court were pending, the appellee told his mother that, if she did not dismiss them, he would revive the criminal prosecution against her, in which event she would be sent to the penitentiary, and further told her that he would kill both himself and her if she did not let the property remain as it was in him; and that, as a result of the threats made to her, she was fraudulently induced by him to dismiss the proceedings in the Anne Arundel County Court.

The bill then alleged that, after the dismissal of those proceedings, the appellee, by like threats, fraudulently induced his mother to execute the deed of March 3rd, 1916, by which she and her husband were deprived of their "life-long savings," and that "in spite of the great advantages obtained by him by his false statements and frauds, at many times he refused to give his father and mother any money and it was necessary during the time of the last illness of her father for the plaintiff to provide him with the necessities of life herself."

The appellee in his answer denied the allegation of the bill that the property was "the life-long accumulation from the labors of the mother and father," and averred that, during the period of its accumulation, they were living with him, and that the property was purchased with the profits of the restaurant or saloon business owned, managed, and conducted by him. That it was from the profits of that business that they were enabled to accumulate the property in question. The appellee was at that time unmarried and with him lived his father and mother, his mother keeping house and his father co-operating with him in carrying on the business, which belonged solely to him. Some of the property acquired was vacant land. This was improved by the defendant erecting houses thereon, and that all the money used in the purchase of property or in the improvements made was furnished by him, and that neither of his parents contributed anything thereto. The defendant further denied that he, by intimation or coercion, or by any kind of fraudulent practice, induced his mother to make either the conveyance of 1914 or 1916, but that the same were the free and voluntary act of his mother and made in justice to him. The answer further averred that the defendant did not answer the proceedings instituted against him in the Anne Arundel County Court, but said to his mother "that if the arrangement he had made * * * was not satisfactory the property could be reconveyed and any new arrangement made about it she might desire," he "feeling at the time that his father and mother had been badly advised by the plaintiff and were acting under the influence of that advice." It was thereafter agreed among the parties in interest, including the appellant, "that the title to the property should be reconveyed to the mother, that the suit in Anne Arundel County, which had never gone to a decree and in which no testimony had ever been taken, should be dismissed, and that the whole matter in controversy should be placed in the hands of Mr. Adam S. Gregorius, an attorney of Baltimore, who spoke the language of the parents and was fully advised as to all the facts and circumstances with reference to the property; how it

was acquired and the disposition which all the parties in interest desired to make of it." In this agreement by the parties, it was understood and agreed that the property, 100 Cypress Street, was to be conveyed to the appellee to be held by him for the use and benefit of the parents during their lifetime, and "after their death" was to go to the plaintiff in this case. Pursuant to this agreement, the deeds of 1916 "were prepared by Mr. Gregorius, executed by the parents," and the arrangement so made which culminated in the execution of said deeds, was acquiesced in by not only the mother and father, but by the plaintiff as well, for the period of thirteen years.

The prayer of the bill asked "that the deeds mentioned in the foregoing bill * * * procured by said defendant be set aside and annulled." In the bill were not only the deeds of 1916 mentioned, but also the deed of 1914, but it may be assumed, we think, that it was only the deeds of 1916 that the prayer asked to be annulled and set aside. Evidence was taken in open court, and, at its conclusion, the learned chancellor decreed "that the deeds made by Antosia Lipinaitis and Vincenti Lipinaitis in March, 1916," be set aside and annulled, and it was from that decree that the appeal in this case was taken.

That the prayer of the bill was not directed to the deed to the son of March, 1914, may be inferred from the fact that the effect of that deed was destroyed, or lost to the son, by the reconveyance of the property by him to his mother, unless the deed of 1914 included property which was not embraced in the deeds of 1916, but, whatever may be said of this, we are only called upon to review the action of the chancellor in refusing to set aside or annul the deeds of 1916, for, as we have said, it was only from the court's refusal to set aside and annul those deeds that the appeal in this case was taken.

The question presented to the court below for its determination, and the one we are here to decide, is whether the deeds of 1916, including the one in which the appellant, Margaret Abromaitis, was beneficiary, were wrongfully and il-

legally obtained from his mother and father, the grantors therein, because of the alleged fraudulent misrepresentation made by the son to the mother, that he told her (1) that, if she did not dismiss the proceedings pending in the Anne Arundel County Court and execute the deeds of 1916, he would revive the criminal prosecution against her already mentioned, in which event she would be sent to the penitentiary and her property taken from her, and (2) that he would kill both himself and her if she did not let the property remain as it was, in him.

Vincenty and Antosia Lipinaitis were Lithuanians who immigrated to this country when their son and daughter, William Vincenty and Margaret, the appellee and appellant in this case, were small children. Upon their arrival here, the father first worked as a common laborer. Thereafter, he opened a saloon on Pratt Street, Baltimore, Md. After the marriage of his daughter to Abromaitis, he turned over the saloon to her and her husband, and he with his wife and son went to Curtis Bay to live. Both the father and the mother were illiterate, unable to read or write. The son, largely through his own efforts, acquired some education. The daughter was less fortunate in this respect, though it is disclosed by the record that she could at least write her name. The father and mother, it seems, owned some property in their native land, though not of much value, as we may infer from the evidence. After being in this country some years, the mother went back to Lithuania, sold the property there, and returned to this country, where she lived with her husband and son. When the father, with his wife and son, removed to Curtis Bay, a saloon was there opened, which it appears was conducted with some financial success, and from the profits of that business, together with the proceeds of the sale of the Lithuanian property, the lands and property here in question were subsequently acquired. It is contended by the appellee, the son, that the saloon was owned, managed, and conducted by him, while the appellant contends that it was owned, managed, and conducted by her father, and upon this question there is a conflict of evidence.

It is contended by the appellant that this case falls within the doctrine of confidential relations, where the burden of proof is upon the grantee to establish to the satisfaction of the court the perfect fairness of the transaction. *Thiede v. Startzman,* 113 Md. 287, 77 A. 666; *Henry v. Leech,* 123 Md. 439, 91 A. 694.

This relation is presumed to exist in cases of guardian and ward, parent and child, attorney and client, and principal and agent, and it may be found in other cases in which it is shown that a confidential relation exists as a fact. In the case of parent and child, the relation is presumed to exist because the child is presumed to be under the control of parental influence, as long as the dominion of the parent lasts. This relation, however, is not presumed to exist when the situation is reversed; that is, between child and parent, unless it be shown that, by the influence of time, or otherwise, the natural relations of the parties have been reversed, that the parent has become the child and the child the guardian of the parent, and where the natural dependence, overweening confidence, and implicit acquiescence of the child in his parent has shifted to the parent, by whom the same dependence, confidence, and implied acquiescence are reposed in the child. Where these facts are shown, a confidential relation exists, and the burden of proof is upon the grantee to show the fairness of the transaction; the general rule being "that he who bargains in a matter of advantage with a person placing a confidence in him, is bound to show that a reasonable use has been made of that confidence, a rule applying equally to all persons standing in confidential relations with each other. *Story's Eq.,* sec. 312," *Colgate D. Owings'* case, 1 Bland, 392, 17 Am. Dec. 311; *Brooks v. Berry,* 2 Gill. 99; *Todd v. Grove,* 33 Md. 188; *Eakle v Reynolds,* 54 Md. 305; *Williams v. Williams,* 63 Md. 371; *Whitridge v. Whitridge,* 76 Md. 54, 24 A. 645; *Zimmerman v. Bilner,* 79 Md. 115, 28 A. 820; *Bauer v. Bauer,* 82 Md. 241, 33 A. 643; *Berger v. Bullock,* 85 Md. 441, 37 A. 368; *Brown v. Mercantile Trust Co.,* 87 Md. 377, 40 A. 256; *Reck's Executor v. Reck,* 110 Md. 497, 73 A. 144; *Kensett v. S. D. Trust Co.,* 116

452

Md. 526, 82 A. 981; *Beinbrink v. Fox*, 121 Md. 102, 88 A. 106; *Reed v. Reed*, 101 Md. 141, 60 A. 621; *Simpson v. League*, 110 Md. 293, 72 A. 1109; *Coburn v. Shilling*, 138 Md. 199, 113 A. 761; *Grove v. Taylor*, 143 Md. 186, 121 A. 923; *Upman v. Thomey*, 145 Md. 360, 125 A. 860; *Figinski v. Modrak*, 151 Md. 146, 134 A. 130; *McGill v. Nichols*, 157 Md. 294, 145 A. 773; *Thiede v. Startzman, supra; Henry v. Leech, supra; Taylor v. Pivec*, 149 Md. 526, 131 A. 757.

It is not, we think, shown in this case that the natural relation of parent and child has been reversed, or that the mother reposed in the appellee, her son, an overweening confidence, or that he exercised influence or control over the mother in the sense that the term is used in the authorities cited. The exact age of the mother, at the time of her death, or at the execution of the deeds of 1916, ten years before, is not shown by the record, nor is it disclosed thereby that, at the time she executed the deeds, she was physically or mentally enfeebled by age. Some years before, she had gone to Europe on the mission of her husband to dispose of the lands there, which she did. As each of the properties was acquired, between 1901 and 1909, the title thereto was placed in her name. This, as the son said, was at her demand, a fact indicating that she was not unmindful of her own interests. It is true, she conveyed the property to her son in 1914, but this was when she was in trouble, charged with a criminal offense and threatened with a possible civil suit. The interest of the son in having the property conveyed to him at that time was to protect his interests therein, which, as he stated, represented his earnings for a number of years. It will be seen that she resorted to the courts to enforce an alleged agreement to reconvey the property to her, showing a readiness and determination to protect her interests, though, in doing so, she was required to take a hostile position against her son. Upon these and other facts found in the record, a confidential relation cannot be found to exist between the parties.

It, therefore, became necessary for the appellant to prove, to the satisfaction of the court, the allegation of the bill that

the mother was induced to execute the deeds of 1916 because of the alleged misrepresentation, or, more appropriately speaking, the alleged threats of the appellee (1) that he would revive the criminal charge against her, and (2) that he would kill both himself and her if she did not execute the deeds to him.

The appellant, in support of the allegations of her bill, testified that, after the execution of the deed of 1914, the appellee married, and, when the mother attempted to get her property back from him, he told her that she had given him these properties, and now to take them from him would break up his home. "My wife is going to leave me," and he said "he had to kill himself. Of course, I did not hear him say he was going to kill my mother, but my mother told me—" She was not permitted to go further with her answer, as to what her mother told her. She was then asked: "After that, did you hear any conversation between your brother Will and your mother or father concerning this criminal charge after the case was dropped?" Her reply was, "I don't quite understand you." She was then asked: "Did or did not your brother Will, after the criminal case against your mother was dropped, threaten to bring the case back to life again? A. After the trial? Q. Yes? A. Before the trial? Q. No, after your mother was dismissed, did your brother ever say he was going to reopen the case? A. No, sir; I don't remember."

And upon Mr. Biggs, counsel of the appellee, saying: "The answer is, no, sir," the witness replied, "No, sir; maybe I can't understand you." She was then asked, "Did you hear your brother say to your mother or father, after the criminal case was over, that if they did not leave the property in his name that he would reopen the criminal case?" This question was objected to as leading, and the objection was sustained. The witness was then told by the court to tell in her own words what her brother had said, and she replied, "I did not finish saying it. As my brother said, he was going to kill himself, then he promised to kill my mother—hang my mother, my mother told me—" She was there

454

stopped by the court and told not to say what her mother had said, and the court asked her, "Did you hear him say it?" And she replied, "Yes, sir; I was there when he says he will kill himself for breaking up the home; that he can't get along with his wife after the properties are taken away. My father, mother, me and him, four of us were there." The court then said: "Your counsel asked you whether you had ever heard him say anything about his having that criminal case reopened?" The witness answered, "Yes, sir. (The Court): You heard him say that? A. Yes, sir. (The Court): Tell us what you heard him say, first of all? A. He says, If you won't leave these properties into my name, we will get these people back, the people that sued for that $20,000.00, and he will hold that out to get the properties and you will lose everything, anyhow." She was then asked if "you were not talking about the bail when you spoke of the $20,000.00 suit," and she answered that she was. The bail, as a matter of fact, was only $3,000, as disclosed by the record.

Peter Abromaitis, husband of the appellant, when asked if he had heard the appellee say anything in connection with his holding the property or wanting to keep it, replied that the appellee said he was going to hold it. He said: "I got it and I am going to pay you something every month so you can live on that; if you take it away from me then somebody else is liable to come and get it back again from you." He never heard William Vincenty Lipinaitis say anything about killing himself or make any representation in connection with the deeds of 1916.

Joseph Kvedera, a nephew of Antosia, heard a conversation between William and his mother, before the execution of the deed of 1914, in which the son told her, "You got that to do, you have to sign those houses to me, otherwise they might take them away from you. You know you are in big trouble now," but he never heard William say anything to his mother in connection with the execution of the deeds of 1916. He, however, testified that his sister, Antosia, at the time of her death in 1926, was over sixty years old, while

her husband, at the time of his death in 1929, was sixty-seven years old.

William Vincenty Lipinaitis testified that the properties here involved were bought with the profits of the business owned and conducted by him at Curtis Bay, with the exception of the proceeds of the sale of the Lithuanian property of his father, which was used in the purchase of the first property bought. He denied absolutely that he said to his mother that he would revive the criminal charge against her, in which event she would lose the property, or that he threatened to kill himself and her if she did not allow the property conveyed by the deed of 1914 to remain in him. He then testified in detail about the purchase of each of the properties bought. In some instances, he stated, vacant lands were purchased and improvements made thereon, all of which were made from the profits of said business. When asked why he was desirous of having the property conveyed to him in 1914, he said, "Well, my mother was in trouble and she continued the practice (of mid-wife) and I was afraid all my earnings were liable to get lost and my father and I would be put out in the street." That he did not appear to and defend the suit against him in the Anne Arundel court, but allowed the decree *pro confesso* to go against him, but, before the case came to trial, an agreement was reached by his mother, father, his sister, and himself by which he was to reconvey the property to his mother and she was again to convey it to him upon the terms and conditions mentioned in the deeds of 1916, and the case was dismissed by his mother. After the agreement was made, which was fully understood and agreed upon by all the parties, as stated by the appellant, "Mr. Gregorius was employed because he spoke the Lithuanian language." His father, mother, sister and himself went to the office of Mr. Gregorius and arranged that he should prepare the deeds. After the deeds were prepared, they again went to his office and there executed them, and their contents, as he stated, were fully explained to his mother, father and sister, and the deed of 1916, in which he was to have the property upon the death of his mother and

father, was witnessed by his sister, "Maggie" Abromaitis. He denied that she expressed any disapproval of the conveyances as made, in one of which she was the beneficiary, and no disapproval was expressed by her during the thirteen years which followed to the death of the father. After the execution of the deeds, he took possession of the property and administered the trust therein to the time of his father's death, without any expression of disapproval of what had been done by either the father or mother. It was admitted by the appellant that there was an agreement between the son and his parents as to the disposition of the property as made by the conveyances of 1916, and she admitted that she went to the office of Mr. Gregorius with her brother, mother and father to have the deeds of 1916 prepared, and again went to his office to execute them, though she testified that she did not approve of the disposition of the property made by them and so told her parents. This, however, was in conflict with the testimony of her brother, who testified that she was much pleased with the disposition of the property so made. She, upon the death of her father, took possession of the property, which by one of these deeds was to be hers upon his death, he having survived his wife. For some reason unknown to us, Mr. Gregorius was not placed upon the stand as witness. There may have been some sufficient cause therefor, but as he was selected because of his familiarity with the Lithuanian language, and could explain fully the transaction to the parties, it would have been decidedly better, if it could have been done, had he been placed upon the stand and testified as to what was said and done at the time of the execution of the deeds, but this important omission is not, we think, in itself sufficient, upon the facts of this case, to defeat the conclusion that the appellant has failed to meet the burden upon her to prove the alleged misrepresentation or threats made by the son to his mother, by which it was alleged she was induced to execute the deeds of 1916. We will, therefore, affirm the decree of the learned chancellor dismissing the bill.

*Decree affirmed, with costs.*